o

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
LAREDO DIVISION

JOSE L. HINOJOSA,                    §
                                     §
            Plaintiff,               §
                                     §
VS.                                  §
                                     §        CIVIL ACTION NO. L-07-97
                                     §
CCA PROPERTIES OF AMERICA, LLC;      §
d/b/a CORRECTION CORPORATION OF      §
AMERICA,                             §
            Defendant.               §


MEMORANDUM AND ORDER


Plaintiff Jose L. Hinojosa sues Defendant CCA Properties of

America, LLC, d/b/a Correction Corporation of America ("CCA")

for violations of Title VII of the Civil Rights Act, 42 U.S.C.

§§ 2000e et seq. ("Title VII"), and the Age Discrimination in

Employment Act, 29 U.S.C. §§ 626 et seq. ("ADEA"). Hinojosa

alleges discrimination based on age, gender, race, and national

origin. (Dkt. No. 2, First Am. Compl. 6-7.)[1] In an order of

---

[1] CCA asserts in its motion for summary judgment that Hinojosa
has agreed to withdraw his racial discrimination claim. (Dkt.
No. 45, Def.'s Mot. Summ. J. 1 n.1; see also Dkt. No. 2, First
Am. Compl. 7.) CCA reports that Hinojosa agreed to withdraw the
claim because he failed to exhaust his administrative remedies.
(Def.'s Mot. Summ. J. 1 n.1.) Hinojosa does not challenge this
assertion, and he does not mention the race discrimination claim
in any filings after his first amended complaint. Hinojosa's
first amended complaint also states that he was wrongfully
terminated "in violation of the Vernon State Statutes of Texas"
(First Am. Compl. 7), but, as with his race discrimination
claim, he does not mention any potential state-law claims in any
subsequent filings. The Court concludes that Hinojosa has

September 30, 2009, the Court denied Hinojosa's motion for summary judgment. (Dkt. No. 55.) In that motion Hinojosa insisted that his case "belongs before a jury." (Dkt. No. 46, Pl's Mot. Summ. J. 6, 19.) Hinojosa also asserted that there was a genuine issue of material fact for each of his claims. (Pl's Mot. Summ. J. 6, 13, 15, 16, 18.) Moreover, he never argued that the evidence so strongly supported his claims that a reasonable jury could not find against him.

CCA's motion for summary judgment is pending. (Dkt. No. 45.) The central issue raised by Defendant's motion is whether Hinojosa retired because he believed his supervisors had generated false allegations against him in order to "intentionally badger, harass[], and coerce[]" him to do so, thereby being constructively discharged. (Dkt. No. 49-17, Hinojosa Aff. ¶ 32, Feb. 7, 2009; Dkt. No. 45, Def.'s Mot. Summ. J. 1, 10-13.)

---

abandoned the racial discrimination claim and any potential state-law claims.

## I. Background[2]

Hinojosa began working as a warden at CCA's detention facility in Laredo, Texas, in July, 1987. (Dkt. Nos. 45-1, 47-1, 49-2, 54-2, Hinojosa Dep. 96:18-22, May 26, 2008.)  On the afternoon of August 3, 2006, he signed a letter purporting to acknowledge his decision to retire, effective the next day. (Hinojosa Dep. 256:17; Dkt. No. 45-13, Retirement Letter 1-2.)[3] Under CCA's stock incentive program, Hinojosa had been awarded restricted stock agreements in 2004, 2005, and 2006. (Dkt. No. 45-16, 2004 stock agrmt.; Dkt. No. 45-17, 2005 stock agrmt.; Dkt. No. 45-18, 2006 stock agrmt.)  For the recipient to actually receive the stock granted under these agreements, the stock first had to vest. (2004 stock agrmt. ¶ 3; 2005 stock agrmt. ¶ 3; 2006 stock agrmt. ¶ 3.)  The terms of vesting differed in the agreements for 2004, 2005, and 2006. (2004 stock agrmt. ¶ 3(iii); 2005 stock agrmt. ¶ 3(iii); 2006 stock

---

[2]  The Court presents the facts based on the admissible depositions, affidavits, and exhibits submitted by the parties, in the light most favorable to Hinojosa.  See Fed. R. Civ. P. 56.

[3]  Hinojosa claims that the letter in evidence is not the one he signed. (Hinojosa Dep. 258:23.)  He claims he signed only a copy, and that CCA later mailed him the original, which he did not sign or return. (Hinojosa Dep. 250:18-25.)  Hinojosa testified that the letter he signed and the letter in evidence differ only in that the one he signed was labeled "copy" and had his and Martin's initials at the top. (Hinojosa Dep. 258:24-25; 261:1-6, 14-25.)  The Court finds that the text of the letter in evidence accurately reproduces the text of the letter Hinojosa signed.

agrmt. ¶ 3(iii).)   The stocks granted in 2004 would vest in February, 2007, or, if Hinojosa retired, they would vest immediately upon his retirement.   (2004 stock agrmt. ¶ 3(iii).) If Hinojosa had been formally discharged any time before February, 2007, the 2004 stocks would have been forfeited. (2004 stock agrmt. ¶ 3(iii).)   The 2005 stocks would vest in February, 2008, or, if Hinojosa retired after February, 2007, they would vest immediately.   (2005 stock agrmt. ¶ 3(iii).)   The 2005 stocks were forfeited if Hinojosa retired before February 2007, or if he were discharged before February, 2008.   (2005 stock agrmt. ¶ 3(iii).)   The 2006 stocks would vest in February, 2009.   (2006 stock agrmt. ¶ 3(iii).)   The 2006 stocks were forfeited if Hinojosa retired, or were discharged, before February, 2009.  (2006 stock agrmt. ¶ 3(iii).)

Accordingly, in August, 2006, the agreements entitled Hinojosa to receive none of the 2004, 2005, or 2006 stocks if he were fired.   However, he was entitled to receive his 2004 stocks if he retired at any time, to receive his 2005 stock options if he retired after February, 2007, and his 2006 options if he retired after February, 2009.   (2004 stock agrmt. ¶ 3(iii); 2005 stock agrmt. ¶ 3(iii); 2006 stock agrmt. ¶ 3(iii).)   In May, 2006, Hinojosa told Steve Conry, CCA's Vice President of Facility Operations, that he had no plans to retire until he turned 72, which would be in August, 2016.   (Hinojosa Aff. ¶¶ 1,

7; Dkt. Nos. 45-12, 47-2, 49-4, Conry Dep., 50:16-25, Sept. 18, 2008.)

### The Bellinger Report

In May and June, 2006, one or more employees at the Laredo facility had called CCA's compliance hotline and accused Hinojosa of allowing Captain Reymundo Reyes to verbally abuse and sexually harass the staff. (Dkt. Nos. 45-6, -7, -8, Call Reports.) In June, Charles Martin, CCA's Managing Director, sent Ruth Bellinger, then an assistant warden at another facility, to visit the Laredo facility and interview staff about the allegations in the hotline calls. (Dkt. No. 45-10, Bellinger Rpt. 1; Dkt. Nos. 45-9, 49-15, Bellinger Dep. 12:6-13:12; 38:12-14, September 10, 2008.) Between June 14 and June 15, 2006,[4] Bellinger spoke with "20 percent of the employees on two shifts," most of whom insisted she omit their names from her report. (Bellinger Rpt. 1; Bellinger Dep. 79:18-80:4.) Nearly all of the interviewed employees said that morale at the facility was very low. (Bellinger Rpt. 2.) Some complained that Hinojosa was not at the facility often enough (Bellinger Rpt. 3, 12), and that when he was there, he was not available.

---

[4] In her September 10, 2008, deposition, Bellinger at one point stated that she visited the Laredo facility on July 14. (Bellinger Dep. 12:22.) However, at another point she says she was there on June 14 and June 15 (Bellinger Dep. 38:12-14), and her written report, dated July 9, 2006, states that she arrived at the facility on June 14, 2006. (Bellinger Rpt. 1.)

(Bellinger Rpt. 6.)   Several complained of favoritism and said they feared retaliation for complaining.   (Bellinger Rpt. 2, 4, 6-9.)   Employees complained that since November, 2005, Captain Reyes had repeatedly mistreated them and the detainees. (Bellinger Rpt. 1-2, 5.)   Some also complained that Hinojosa would not control Reyes (Bellinger Rpt. 2, 5-7), and that Hinojosa had given jobs at the facility to members of his and Reyes's families.   (Bellinger Rpt. 2, 6-9.)   Bellinger noted that the facility's shift schedule did not reflect employees' actual work schedules.   (Bellinger Rpt. 1.)   According to Bellinger, on June 29 Hinojosa told her that he had known Reyes for 15 years and regarded him as "a great employee." (Bellinger Rpt. 12.)   Bellinger put her findings in a confidential report sent to Martin on July 9.   (Bellinger Rpt. 1.)   Hinojosa was aware that Bellinger had investigated the facility in mid-June, 2006, in response to complaints made over the hotline (Hinojosa Dep. 136:8-14), although at his deposition, in May, 2008, he could not recall the specific allegations she investigated. (Hinojosa Dep. 136:20-23.)   Hinojosa did nothing to investigate or discipline Reyes until, in either late June or late July, 2006, he asked Martin for permission to fire him.   (Hinojosa Dep. 335:9-10 (saying he contacted Martin about Reyes sometime between June 16 and June 21); 397:12-22 (saying he contacted Martin sometime between July 17 and July 21.))   Hinojosa was not

aware of any complaints about Reyes's conduct until shortly before he asked Martin for permission to fire him. (Hinojosa Dep. 397:23-25.) Martin did not allow Hinojosa to fire Reyes; instead, Martin had Hinojosa suspend Reyes for three days, without pay. (Hinojosa Dep. 335:9-10; 397:12-17; Hinojosa Aff. ¶ 22.b.)

### The Fernandez Accusations

In July, 2006, the Laredo facility's business manager, Margaret Fernandez, had called CCA headquarters and accused Hinojosa of duplicating meal receipts from official travel, abusing CCA's gasoline reimbursement policy, arriving to work late and leaving early, and cashing personal checks from the facility's inmate petty cash fund. (Dkt. Nos. 45-11, 47-3, 49-4, Kennedy Dep. 21:9-18; 66:1-12, Sept. 17, 2008.) Fernandez's calls prompted Steve Kennedy, CCA's Director of Operational Finance, to order an audit of the Laredo facility's business office. (Kennedy, Dep. 21:9-18; 22:2-11.) On August 1, 2006, Martin and Kennedy arrived at the facility. (Hinojosa Dep. 241: 4-14; Kennedy Dep. 16:5.) The purpose of their visit was to investigate the Fernandez accusations and the accusations underlying the Bellinger report. (Kennedy Dep. 21:9-18; 65:25-66:12; 68:4-14; 118:2-18; Dkt. Nos. 45-5, 47-4, 49-5, Martin Dep. 21:11-15; 22:21-24; 33:2-6, May 27, 2008.) Kennedy was

responsible for investigating the three Fernandez accusations
relating to finances: that Hinojosa had duplicated meal
receipts, abused CCA's gasoline reimbursement policy, and cashed
a check from the petty cash fund. (Kennedy, Dep. 21:9-18; 48:9-
12; 22:2-11; 49:1-60:18; 68:6-14.)  Martin was not responsible
for investigating any of these "expense impropriet[ies]."
(Martin Dep. 29:14-17.)  Instead, he was there to investigate
Fernandez's allegation concerning Hinojosa's work schedule, and
also the problems indicated in the Bellinger Report.  (Martin
Dep. 22:20-24; 33:10-20; 106:13-16; Kennedy Dep. 21:9-18; 65:25-
66:8; 68:9-11.)  The matters raised in the hotline calls and the
Bellinger Report were not within the scope of Kennedy's
investigation.  (Martin Dep. 22:20-24; Kennedy Dep. 21:9-18;
68:9-11.)

     August 1 to August 3, 2006

     Until August 1, the first day of Martin and Kennedy's
visit, CCA had treated Hinojosa fairly, and he had experienced
"no problem whatsoever" with the company (Hinojosa Dep., 423:8-
22), except that "every once and a while" Martin and Conry would
ask him about retirement.  (Hinojosa Dep. 237:11-22; 423:21-22.)
Prior to August 1, Martin and Conry inquired about Hinojosa's
plans a total of ten to fifteen times, but he did not think

these inquiries "were discrimination." (Hinojosa Dep. 237:11-20; Hinojosa Dep. 423:23-25.)

On the morning of August 1, Martin and Kennedy met Hinojosa in the facility parking lot and told him that they were going to conduct an investigation, and that he would be placed on paid leave until it was complete, "because the employees were saying that they were in fear of retaliation." (Martin Dep. 33:12-16; 102:17-19; see also Hinojosa Dep. 226:13-15; 243:20-22; Hinojosa Aff. ¶ 8.) There are varying accounts of what was said at this encounter. According to Hinojosa, Martin and Kennedy told him that they were investigating the allegations Fernandez had made: duplicating receipts, abusing the gasoline reimbursement policy, cashing a check from petty cash, and arriving late and leaving early. (Hinojosa Dep. 148:1-14; 226:13-20; 241:13-17; 386:21-25; Hinojosa Aff. ¶¶ 8-9.) This was the first Hinojosa heard of the Fernandez allegations. (Hinojosa Dep. 235:10-12.) He was not upset, however, because he was confident Martin and Kennedy would find no evidence to support them. (Hinojosa Dep. 241:18-19, 23-25; 243:13-15, 20-22.) Kennedy and Martin did not ask Hinojosa any questions about retirement (Hinojosa Dep. 243:17-19), and they did not tell him that Martin was there to investigate the allegations in the Bellinger Report. (Hinojosa Dep. 148:1-14; 226:16-20; 241:13-17; 386:22-25; Hinojosa Aff. ¶¶ 8-9; Kennedy Dep. 65:25-66:8; 68:9-11; Martin Dep. 22:20-24;

33:10-23.)    Martin's deposition testimony is somewhat unclear regarding what accusations Hinojosa was told about on August 1. Martin was clear that he told Hinojosa about the accusations regarding the petty cash and the gasoline reimbursements (Martin Dep. 103:12-15), and that he told Hinojosa that he would investigate whether Hinojosa spent enough time at the facility. (Martin Dep. 106:13-16.)    However, Martin could not recall whether he and Kennedy told Hinojosa "all of the things he was under investigation for." (Martin Dep. 102:24-25.)    Martin also testified that, at some point, he told Hinojosa about a concern regarding "an employee that had received two days' suspension" (Martin Dep. 93:1-15; 103:15-17), and a concern about "some agreements that had been written." (Martin Dep. 103:15-25.) Hinojosa's and Kennedy's testimony contain no mention of Martin telling Hinojosa about these two concerns.

Martin also testified that on August 1 Hinojosa asked what the investigation had yielded so far, and what CCA was going to do with him. (Martin Dep. 21:16-23.)    Martin replied that it was possible Hinojosa would be transferred, and "that he may not move as a warden." (Martin Dep. 21:21-23.)    Hinojosa then asked whether he would get his stocks if he instead retired: ". . . he asked  . . . would his stocks mature at that time because he had

just turned [62]." (Martin Dep. 21:24-22:4.)[5]  Martin told
Hinojosa that he would have to get an answer for him from
someone else at CCA. (Martin Dep. 90:22-24.) Joe Driskell, a
former CCA warden, testified that he spoke to Martin shortly
after Hinojosa signed the retirement letter, and that Martin
said that he "had to fire Joe," although Driskell could not
remember Martin's exact words. (Dkt. No. 49-6, Driskell Dep.
11:23-12:13; 12:12-22.) Hinojosa does not claim that Martin
ever told him he was fired, and nothing in Hinojosa's testimony
regarding the period from August 1 to August 3 indicates that
Martin mentioned possible demotion, transfer, or discharge.
(Hinojosa Dep. 243:13-23; 243:25-245:7; 248:18-25; 256:12-18.)

Only one of the Fernandez accusations was substantiated in
the course of Martin's and Kennedy's investigations at the
facility, carried out from August 1 to August 3. Martin was
satisfied with Hinojosa's and the facility's work schedules.
(Martin Dep. 106:9-107:3.) Kennedy concluded that the
allegations of duplicated receipts and abuse of the gasoline
reimbursement policy were either trivial or unsubstantiated.
(Kennedy Dep. 30:11-13; 50:3-7; 59:15-19; 61:3-9; 78:2-4.)

---

[5] In the context of Martin's deposition, the Court understands
the words "would his stocks mature at that time" to mean that
Hinojosa wondered whether his stocks would vest if he retired.
Neither Hinojosa's nor Martin's testimony makes clear which of
Hinojosa's 2004, 2005, or 2006 stocks were at issue in any of
their discussions concerning Hinojosa's stock awards. (Hinojosa
Dep. 251:11-20; Martin Dep. 22:4-5; 91:1-2, 17-20.)

However, Kennedy did find, and Hinojosa admits, that he took money from the inmate petty cash fund in exchange for a personal check. (Kennedy Dep. 22:16-18; Martin Dep. 107:17-20; Hinojosa Aff. ¶ 22.f.) Hinojosa claims this did not violate company policy because he had Fernandez's permission. (Hinojosa Aff. ¶ 22.f.) Kennedy did not write a report of his findings. (Kennedy Dep. 60:19-25.) On either the night of August 1 or the morning of August 2, Martin told Kennedy that Hinojosa was going to retire, so Kennedy did not think a report was necessary. (Kennedy Dep. 57:23-24; 58:3-11; 60:19-25; 63:4-13.)

Hinojosa and Martin spoke on the phone on August 2. (Hinojosa Dep. 243:25-244:3; Martin Dep. 22:4-12.) Martin told Hinojosa they would have a conference call on August 3, with Hinojosa, Martin, Kennedy, and Conry. (Hinojosa Dep. 244:1-5.) Hinojosa's and Martin's accounts of the remainder of the August 2 call differ. Martin testified that he mentioned that Hinojosa had given an employee a two-day suspension without the required permission. (Martin Dep. 93:1-15.) Martin also testified that he told Hinojosa that "his stock options and shares . . . would mature" if Hinojosa retired, (Martin Dep. 90:20-91:2) and that Hinojosa responded: "I guess I'll just go ahead and retire then." (Martin Dep. 22:5-6; 91:3.) According to Hinojosa, he and Martin discussed only the arrangements for the August 3 conference call. (Hinojosa Dep. 244:11-14.) However, Hinojosa

testified that at some unspecified time Martin told him that his 2005 and 2006 stock options would vest if he retired. (Hinojosa Dep. 251:14-20.)

On the morning of August 3, Hinojosa participated in the planned conference call with Martin, Kennedy, and Conry. (Hinojosa Dep. 245:11-246:1.) The conference call lasted about five minutes. (Hinojosa Dep. 248:5; Conry Dep. 102:22.) Again, there are conflicting accounts of what was said during the call. Hinojosa testified that, at the beginning, Conry said to him "Joe, it's about—you're about ready to retire. I think it's time for you to retire. You've been there too long." (Hinojosa Dep. 245:16-21; see also 228:4-6.) Hinojosa then interrupted and said he was not ready for retirement. (Hinojosa Dep. 245:22-24; 246:23-25.) He then said to Kennedy either: "I want to know what the outcome of your investigation is because there's [sic] some serious allegations against me" (Hinojosa Dep. 245:24; 247:2-16); or "[t]hose were some serious allegations against me. What was the outcome of those investigations?" (Hinojosa Dep. 314:6-9.) Kennedy responded "Joe, [H]ijo, those allegations were unsubstantiated." (Hinojosa Dep. 247:5-8; see also 247:2, 14-16; 248:22-25; 314:6-9; 326:25-327:5; 376:22.) Hinojosa's testimony makes clear that this exchange concerned the Fernandez accusations involving financial improprieties and Hinojosa's work schedule:

> Q. . . . were the charges that Kennedy and Connery [sic] spoke to you about had [sic] to do with - inappropriate expenditures?
>
> A.    Expenditures, they were saying that I was duplicating receipts for my expense statement and leaving early and not working there, and - and - and I asked them very specifically.  I mean, those are very serious charges against my - against me; and he said well, they - they were unsubstantiated.

(Hinojosa Dep. 376:14-22.)  Martin did not say anything during the conference call.  (Hinojosa Dep. 248:18-25; see also Martin Dep. 113:14-114:11.)  According to Hinojosa, at the end of the conference call, Conry again told him he wanted him to retire:

> And then [Conry] said: Well, it's time for you to retire.  Hijo, I'm going to type a letter up, and I want you to sign it.  Charles [Martin] is going to call you, and I want you to sign it and then send it back to me.

(Hinojosa Dep. 247:23-248:1.)  Hinojosa avers that he was never told he might be transferred or demoted during the call.  (Hinojosa Dep. 254:22-255:6.)

According to Kennedy, Hinojosa asked him only about the accusation that he abused the gasoline reimbursement policy.  (Kennedy Dep. 50:3-7; 50:17-19.)  Kennedy concedes he told Hinojosa that this accusation was not substantiated.  (Kennedy Dep. 47:22-23; 50:3-7; 50:17-19.)  According to Martin, Hinojosa did not ask about any of the investigation's results during the conference call.  (Martin Dep. 114:9-11.)  According to Conry, he and Hinojosa discussed only Hinojosa's admission that he borrowed from the facility's petty cash fund.  (Conry Dep.

44:13-18.)    Conry  testified  that,  before  the  conference  call,
Martin  had  told  him  that  Hinojosa  had  decided  to  retire  (Conry
Dep.  162:17-18),  and  that  Hinojosa  confirmed  this  during  the
call.  (Conry  Dep.  50:4.)   Conry  testified  that  he  told  Hinojosa
that  "[he]  had  lost  confidence  in  [Hinojosa's]  ability  to  remain
as  the  warden  of  that  facility  based  on  [Hinojosa's  borrowing
from  the  inmate  petty  cash  fund]  and  the  findings  of  the
Bellinger  report."   (Conry  Dep.  44:18-21.)   Hinojosa  makes  no
mention  of  this  remark  in  his  account  of  the  conference  call.
(See  Hinojosa  Dep.  245:8-248:25;  314:1-315:1;  326:7-327:2.)
Conry  denies  that  he  told  Hinojosa  that  it  was  time  for  him  to
retire  (Conry  Dep.  49:19-21),  but  he  admits  that  he  told
Hinojosa  that  he  had  been  at  the  Laredo  facility  too  long:  "I
had  said  that  this  is  the  type  of—these  investigative  issues,
these  are  things  that  typically  happen  when  a  warden  stays  in
one  facility  too  long."  (Conry  Dep.  51:2-6.)

     After  the  conference  call,  Conry  caused  CCA's  legal
department  to  write  a  letter  purporting  to  memorialize
Hinojosa's  retirement  and  its  terms.   (Conry  Dep.  162:17-24;
Retirement  Letter  1.)   The  letter,  addressed  from  Conry  to
Hinojosa,  states  "[a]s  discussed  with  you,  my  understanding  is
that  you  have  no  outstanding  stock  options,  that  the  800
restricted  shares  granted  to  you  in  2004  will  vest  immediately
upon  your  retirement  .  .  .  and  that  the  restricted  shares

granted to you in 2005 and 2006 will be forfeited." (Retirement Letter 1.)   Conry testified that he included this language because "Mr. Hinojosa had specifically asked and wanted assurances that he would get what we were telling him were [sic] available to him . . . ." (Conry Dep. 102:7-9.)

In the afternoon of August 3, Hinojosa met Martin in a What-a-Burger parking lot, where Martin gave him a copy of the letter. (Hinojosa Dep. 250:17-19.)   Hinojosa read the letter and signed it (Hinojosa Dep. 251:2; 256:17; 258:2; Retirement Letter 2), but he told Martin that he did not agree to its terms, and that "[t]his is not right." (Hinojosa Dep. 251:21; 256:17-18.)   Hinojosa denied being forced to sign the letter, and he conceded that he could have not signed it. (Hinojosa Dep. 258:2-6.)   However, he testified that giving him the letter, Martin said "I need for you to sign it," and "[h]ere's the letter that Steve [Conry] wants you to sign," and in his subsequent affidavit Hinojosa says "Mr. Martin instructed me to sign [the] letter of resignation." (Hinojosa Dep. 250:7, 18-19; Hinojosa Aff. ¶ 12.)   The following day, Hinojosa signed a "Payroll Termination Form" that listed the reason for termination as "EMPLOYEE RETIRED." (Dkt. No. 45-14, Payroll Termination Form.)   CCA replaced Hinojosa with Juan Diaz (Hinojosa Dep. 273:21-22), who was 52.

## II. Standard of Review

The Court should render summary judgment "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); <u>see also</u> <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322–23 (1986); <u>Little v. Liquid Air Corp.</u>, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc). A fact is material if its resolution could affect the outcome of the action. <u>DIRECT TV Inc. v. Robson</u>, 420 F.3d 532, 536 (5th Cir. 2006) (internal citations omitted). An issue of fact is genuine if there is evidence from which a reasonable jury could accept the nonmoving party's version of events. <u>Id.</u> The Court must review the evidence and draw inferences from it in the light most favorable to the nonmoving party. <u>Reaves Brokerage Co. v. Sunbelt Fruit & Vegetable Co.</u>, 336 F.3d 410, 412 (5th Cir. 2003).

## III. Discussion

### 1. Constructive Discharge

In the Fifth Circuit, courts analyze Title VII and ADEA claims using the "modified <u>McDonnell Douglas</u> approach." <u>Rachid v. Jack In The Box, Inc.</u>, 376 F.3d 305, 312 (5th Cir. 2004). Under this approach, the employee must first establish a prima

facie case.  Id.  The elements of the prima facie case for age discrimination are (1) that the plaintiff was discharged; (2) that he was qualified for the position; (3) that he was within the protected class at the time of discharge; and (4) that he was either i) replaced by someone outside the protected class,[6] ii) replaced by someone younger, or iii) otherwise discharged because of his age.  Id. at 309 (citing Palasota v. Haggar Clothing Co., 342 F.3d 569, 576 (5th Cir. 2003) (per curiam)).[7]

---

[6] Some Fifth Circuit opinions have stated that to satisfy the fourth element, the plaintiff must show he was replaced by someone outside the protected class. E.g. Faruki v. Parsons S.I.P., Inc., 123 F.3d 315, 319 (5th Cir. 1997); Meinecke v. H & R Block of Houston, 66 F.3d 77, 83 (5th Cir. 1995).  These cases conflict with O'Connor v. Consolidated Coin Caterers Corp., 517 U.S. 308 (1996), in which the Supreme Court held that the ADEA requires only that the plaintiff show that the "'*employment decision was based on a[n] [illegal] discriminatory criterion.*'" Id. at 312 ((quoting Teamsters v. United States, 431 U.S. 324, 358 (1977)).

[7] In substance, the three-part disjunction of the fourth element amounts to a requirement that the plaintiff was discharged because of his age.  See Rachid, 376 F.3d at 309 (summing up the disjunctive formulation by stating "[t]hat is, regardless of how much younger his replacement is, a plaintiff in the protected class may still establish a prima facie case by producing evidence he was 'discharged because of his age.'" (quoting Palasota, 342 F.3d at 576)).  The O'Connor Court's statement that "the fact that an ADEA plaintiff was replaced by someone outside the protected class is not a proper element of the McDonnell Douglas prima facie case," 517 U.S. at 312, would seem to counsel in favor of abandoning the disjunctive formulation in favor of a simple statement that the plaintiff must show he was discharged because of his age.  This has been done in some opinions by courts in the Fifth Circuit, e.g., Ross v. University of Texas at San Antonio, 139 F.3d 521, 525 (5th Cir. 1998)(stating the fourth element as a requirement of "some evidence that the employment decision was motivated by unlawful

The ADEA's protected class consists of people over age 40.   29 U.S.C. § 631.   Hinojosa was born on August 1, 1944, making him age 62 when he retired.   (Hinojosa Aff. ¶ 1.)

The pivotal issue raised by the pending motion is whether there is evidence from which a reasonable jury could accept Hinojosa's claim that his decision to retire was the result of constructive discharge.   (Hinojosa Aff. ¶ 18.)   A constructive discharge occurs when an employer makes working conditions so intolerable that a reasonable employee would feel compelled to resign.   Id. The inquiry focuses on how events leading up to the plaintiff's resignation would affect a reasonable employee's state of mind; "the employer's intent in creating the allegedly intolerable conditions is irrelevant at this stage."   Guthrie v. J.C. Penney Co., Inc., 803 F.2d 202, 207 (5th Cir. 1986). However, how a reasonable employee *would interpret* the employer's intent behind the actions precipitating the resignation can be decisive.   E.g., Brown v. Bunge Corp 207 F.3d 776, 782 (5th Cir. 2000) (no constructive discharge without any objective indication that supervisor's demands for better

---

age discrimination"); Gray v. Sears, Roebuck & Co., 131 F.Supp.2d 895, 903 (S.D. Tex. 2001) (same), but Fifth Circuit opinions retaining the disjunctive formulation are more numerous and more recent.   E.g. Berquist v. Washington Mutual Bank, 500 F.3d 344, 349 (5th Cir. 2007) (quoting Rachid, 376 F.3d at 309); Palasota, 342 F.3d at 576; Brown v. Bunge Corp., 207 F.3d 776, 781 (5th Cir. 2000).

performance were calculated to encourage the employee to resign); see also Stephens v. C.I.T. Group/Equip. Financing, 955 F.2d 1023, 1028 (5th Cir. 1992) (substantial evidence of constructive discharge where employee "reasonably could have believed that his demotion was a harbinger of dismissal"); Guthrie, 803 F.2d at 207 (finding substantial evidence of constructive discharge because the employer downgraded employee's performance rating, a move "recognized as a first step toward dismissal," and singled him out for reprimands he reasonably believed were pretextual).

Courts consider a number of factors when deciding whether an employee's working conditions were so intolerable that a reasonable person would have felt compelled to resign. Brown, 207 F.3d at 783. Employers can constructively discharge an employee by:

> (1) demotion; (2) reduction in salary; (3) reduction in job responsibilities; (4) reassignment to menial or degrading work; (5) reassignment to work under a younger person; (6) badgering, harassment, or humiliation by the employer calculated to encourage the employee's resignation; or (7) offers of early retirement that would make the employee worse off whether the offer were accepted or not.

Id.

Hinojosa's allegations do not involve methods (1) through (5). CCA did not demote Hinojosa or force him to transfer. (Hinojosa Dep. 254:22-255:6.) There is no evidence CCA reduced

his salary, permanently reduced his responsibilities, assigned him menial or degrading work, or reassigned him to work under a younger person.  In a different context, courts have held that misrepresentations about an employee's rights can render an employee's otherwise voluntary choice to leave his job involuntary.  E.g., Covington v. Department of Health and Human Services, 750 F.2d 937, 942 (Fed. Cir. 1984); Scharf v. Department of the Air Force, 710 F.2d 1572, 1575 (Fed. Cir. 1983).  In this case, however, there is no evidence Hinojosa was ultimately mislead regarding the terms on which he could retire. He testified that he read the letter purporting to memorialize the terms of his retirement before he signed it, and that he noticed that the letter stated he would forfeit the 2005 and 2006 options.  (Hinojosa Dep. 251:11-21; 258:14-261:6.)[8]

---

[8] In January, 2007, CCA's Assistant General Counsel Susan Lindsey sent a letter to the Equal Employment Opportunity Commission in response to notice of Hinojosa's discrimination complaint. (Dkt. No. 49-1 pp. 19-23, Lindsey Letter 1.)  Lindsey's letter stated that on August 2, 2006, Martin "contacted Hinojosa and informed him that [CCA] would agree to allow him to resign in lieu of any potential disciplinary action . . . in exchange for accelerated vesting of his stock options."  (Lindsey Letter 4.) The letter purports to be based solely on Lindsey's preliminary understanding of the facts underlying Hinojosa's claims as of the date of the letter.  (Id. at 1 n.1.)  The letter also states that it was submitted "for the sole purpose of responding to the government's request for information and to facilitate the Commission's statutory duty to attempt to conciliate and settle disputed matters."  (Id.)  And that "[by] submitting this position statement, CCA in no way waives its right to present new, different, or additional facts, arguments, or objections

Hinojosa's allegations involve factors (6) and (7). He alleges that Martin's and Kennedy's investigations constituted harassment calculated to get him to retire (Dkt. No. 54, Pl.'s Sur-Reply 4; Hinojosa Aff. ¶ 33), and that, during the August 3 conference call, Conry effectively threatened him with discharge if he refused to retire. (First Am. Compl. 4.) The Court will consider these allegations together. See <u>Brown</u>, 207 F.3d at 782 (the constructive discharge factors may be considered singly or in combination).

"An early retirement option can constitute a constructive discharge only if the employee shows that it sufficiently alters the status quo [such] that each choice facing the employee makes him worse off." <u>Christopher v. Mobil Oil Corp.</u>, 950 F.2d 1206, 1211 (5th Cir. 1992.). As the Court understands the Fifth Circuit's cases applying this test, an employee claiming he had to choose between retiring or facing adverse employment action must show: 1) that he reasonably believed that the employer was seriously considering the adverse action; and 2) that he reasonably believed that the employer was *not* making a good-faith effort to enforce company policy or ensure satisfactory performance of the kind inherent in every employee's status quo.

---

based upon subsequently acquired information or evidence for substance or clarification." (<u>Id.</u>)

Hinojosa can show that he reasonably believed that both retirement and discharge would have left him worse off than if he had been allowed to keep working with no adverse action ever materializing from Martin's and Kennedy's investigations. If he had been discharged in August 2006, he would have lost all of his stock options, including those awarded in 2004. (2004 stock agrmt. ¶ 3(iii).) Rather than take that risk, Hinojosa chose to retire, which cost him only the 2005 and 2006 options. (See 2005 stock agrmt. ¶ 3(iii); 2006 stock agrmt. ¶ 3(iii).) If he had worked until his planned retirement age of 72, however, the 2005 and 2006 options would have vested. (See Hinojosa Aff. ¶ 7; Conry Dep. 50:23-24; 2005 stock agrmt. ¶ 3(iii); 2006 stock agrmt. ¶ 3(iii).) There is some evidence that the reason Hinojosa signed the retirement letter was to preserve the 2004 options. (Hinojosa Dep. 256:2-24 (explaining that he signed the letter "[b]ecause I needed those stock options to build my basket, to get my money in there, so I can sue them."))

Each of the choices Hinojosa faced, therefore, was worse than continuing to work without risk of being demoted or discharged due to the Fernandez allegations or the Bellinger Report. However, that is not necessarily the relevant "status quo" for purposes of the constructive discharge analysis. See Christopher, 950 F.2d at 1214. This and other circuits have eschewed a bright-line rule as to whether threatened discipline

should be considered part of an employee's status quo when assessing whether he was constructively discharged.  It cannot be said that an employer compels an employee to retire by informing him of legitimate investigations of alleged misconduct, or by demanding a level of performance without which the employer does not think the employee is worth retaining.  See Henn v. National Geographic Association, 819 F.2d 824, 829-30 (7th Cir. 1987) (signs of displeasure at falling productivity that impliedly threaten discharge do not constitute constructive discharge because "[a]n employer's communication of the risks of the job does not spoil the employee's decision to avoid those risks by quitting."); see also Bodnar v. Synpol, Inc., 843 F.2d 190, 194 (5th Cir. 1988) (relying on Henn for the proposition that constructive discharge requires that each option with which an employee is presented must make him worse off).  Good-faith efforts to enforce company policy or ensure satisfactory performance are necessarily part of every employee's status quo, along with the possibility that those efforts will culminate in adverse employment action.  See Washington v. Occidental Chem. Corp., 24 F.Supp.2d 713, 725-26 (S.D. Tex. 1998) (holding that the choice of turning down a retirement offer was no worse than the employee's status quo, even though the employee reasonably believed she would be fired for poor performance if she turned down the offer).  If any employee who retires in the face of

such action were deemed to be constructively discharged, then employers would risk ADEA liability every time they made good-faith efforts to get older staff to follow company policy or improve their work. See Henn, 819 F.2d at 829. For instance, the Fifth Circuit has found insufficient evidence of constructive discharge where an employee could not have reasonably believed that a demand that he meet performance goals he thought were unrealistic was designed to compel him to retire. Brown, 207 F.3d at 779-80.

It is quite possible, however, for an employer to effect constructive discharge with threats of adverse action based on pretextual accusations of policy violations or poor performance. For example, the Fifth Circuit found sufficient evidence to uphold a verdict of constructive discharge where a supervisor downgraded the plaintiff's performance rating, a move "recognized as a first step toward dismissal," for criticism that the plaintiff reasonably believed was merely a pretext to pressure him to retire. Guthrie, 803 F.2d at 207. In another case, the Fifth Circuit reversed summary judgment for an employer where the plaintiff testified his supervisor told him the company wanted him to retire before the mandatory retirement age, or he would be discharged and lose his benefits. Downey v. Southern Natural Gas Co., 649 F.2d 302, 305 (5th Cir. 1981). The Fifth Circuit reasoned that "[a] reasonable person might

well feel compelled to resign in the face of such a statement."
Id.; see also Smith v. World Ins. Co., 38 F.3d 1456, 1461 (8th
Cir. 1994) (constructive discharge found where supervisor
threatened to "turn the screws and build a file" against
employee, leading to discharge without benefits).   Downey
differs from Hinojosa's case in that there was no evidence that
the employer had been dissatisfied with Downey's performance or
that Downey was subject to a legitimate disciplinary
investigation.   Id. at 303-04.   These cases indicate that an
employee who retired because of signs his employer was unhappy
with his conduct or performance must show that he reasonably
believed that his employer was pretending dissatisfaction in
order to convey a threat to discharge him if he refused to
retire.   If the employee cannot make that showing, then the risk
that the employer's dissatisfaction would culminate in discharge
is simply an inevitable aspect of the employee's status quo for
purposes of the constructive discharge analysis.

While there are factual disputes over precisely what was
said during the conversations in early August, 2006, no
reasonable account of the events from August 1 to August 3,
2006, can show *both* that Hinojosa reasonably thought he might be
discharged if he refused to retire *and* that *pretextual*
allegations would be the basis of the threatened discharge.

Even were a jury to believe that Conry told Hinojosa during the August 3 conference call that he had lost confidence in him due to his admission regarding the petty cash incident and the findings in the Bellinger report, there is insufficient evidence to show that Hinojosa reasonably thought that he was threatened with discharge for *pretextual* reasons.  Hinojosa was aware that the petty cash allegation and Bellinger report were not pretextual.  He could not have reasonably interpreted Conry's remark as anything other than an expression of sincere dissatisfaction with Hinojosa's performance.  While there is no evidence that Hinojosa had read Bellinger's report, he was aware that Bellinger had visited the facility in mid-June to investigate employee complaints made through the hotline. (Supra pp. 5-6.)  He may have been frustrated that Conry faulted him for Bellinger's findings after Martin had refused to allow him to fire Reyes, but he had no reason to believe that Reyes's conduct was the exclusive subject of the calls or of Bellinger's inquiries, and he could not have reasonably believed that Martin's refusal to let him fire Reyes vindicated his handling of the problem.  Conry could reasonably have been dissatisfied that Hinojosa had been unaware of Reyes's conduct until at least a month after it had prompted employees to call the hotline and that, when he did became aware of it, Hinojosa made no attempt to control Reyes with lesser sanctions before asking Martin for

permission to fire him.   (Supra p. 6.)   Hinojosa points to Kennedy's statement that "those allegations" were unsubstantiated to show that Conry's reasons for being dissatisfied with him were pretextual.   However, Hinojosa could not have reasonably interpreted Kennedy's remark as encompassing the petty cash allegation and the complaints that prompted Bellinger's investigation.   He did not know that the complaints Bellinger investigated were among the matters Kennedy and Martin had investigated after they arrived at the facility on August 1 (see supra pp. 8-9, 13-14), and he had admitted that the petty cash allegation was true (see Hinojosa Aff. ¶ 2.f). Furthermore, Hinojosa's testimony indicates that he did not interpret Kennedy's remark as encompassing matters beyond the remaining three Fernandez allegations, i.e., that Hinojosa duplicated receipts, abused the gasoline reimbursement policy, and did not spend enough time at the facility.   (See supra pp. 13-14.)

Thus, assuming Conry made the loss-of-confidence remark, Hinojosa's "status quo" in August, 2006, was that he was the warden of the Laredo Facility, under investigation for possible performance deficiencies, which might or might not have resulted in disciplinary action if he had stayed.   There is no evidence that rejecting an invitation to retire would have changed his situation at all, i.e. it would not have changed his status quo.

The Third Circuit has observed that "[w]hen one option makes the recipient better off, and the other is the status quo, then the offer is beneficial." <u>Gray v. York Newspapers, Inc.</u>, 957 F.2d 1070, 1081 (3d Cir. 1992).  Likewise, when one option makes the recipient worse off, but the other is the status quo, the offer is neutral.  Hinojosa may have reasonably believed that Conry would demote or discharge him on the basis of the petty cash issue and the Bellinger Report, but Conry's efforts to enforce CCA's policies to ensure that the Laredo facility was professionally managed do not make CCA responsible for Hinojosa's resignation.

Assuming Conry did *not* tell Hinojosa that he had lost confidence in him because of the petty cash admission and the Bellinger report, Hinojosa cannot show that he reasonably believed that he might be demoted or discharged if he refused to retire.  Hinojosa was aware that he had been accused of duplicating travel receipts, abusing the gasoline reimbursement policy, and not spending enough time at the facility, but he could not have reasonably believed that any of these accusations would culminate in demotion or discharge.  On August 1, Hinojosa was confident that Martin and Kennedy's investigation of these matters would yield no evidence of wrongdoing, and on August 3 Kennedy told him that these allegations were unsubstantiated. (<u>Supra</u>, pp. 9, 13-14.)  The only evidence that Hinojosa was

informed of possible adverse employment action based on these allegations (as opposed to the Bellinger report and the petty cash allegation) is Martin's testimony that he told Hinojosa on August 1 that it was possible Hinojosa would be demoted and transferred. (Martin Dep. 21:20-23.) Hinojosa could only have interpreted Martin's comment to extend to those allegations he was aware that Martin and Kennedy were investigating on August 1, relating to travel receipts, gasoline reimbursements, his work schedule, and the petty cash. (Supra pp. 8-9.) The petty cash allegation proved to be true. (Hinojosa Aff. 22.f.) Any reasonable concern that Fernandez's other allegations could lead to adverse employment action would have been dispelled during the August 3 conference call, when Kennedy told him that they were unsubstantiated.[9] Thus, assuming Conry did not make the loss-of-confidence remark, CCA did nothing to alter Hinojosa's "status quo." Under those circumstances, Hinojosa cannot have reasonably believed that, if he refused Conry's suggestion that he retire, he would be punished with discharge.

Finally, there is the evidence that, prior to August 1, Martin and Conry asked Hinojosa ten to fifteen times whether or when he would retire, and Joe Driskell's testimony that Martin

---

[9] A reasonable jury could conclude that Hinojosa understood Martin's August 1 comment about possible demotion to be about the petty cash allegation. In that case, however, Hinojosa could not have reasonably believed that the accusation was a threat to discharge him for pretextual reasons.

told him he had to fire Hinojosa.  (Driskell Dep. 11:23-12:2.)
Hinojosa testified that he did not regard Martin and Conry's
pre-August 1 inquiries about his retirement plans as
discriminatory.  (Supra, p. 8.)  Moreover, there is still no
evidence that Martin did anything that Hinojosa could have
reasonably interpreted as a threat to punish him for spurious
allegations if he refused to retire.  Martin's subjective intent
to terminate Hinojosa is irrelevant to the issue of whether
Hinojosa was constructively discharged.  See Guthrie, 803 F.2d
at 207 (employer's intent in creating allegedly intolerable
conditions irrelevant in constructive discharge analysis).

In sum, while there are genuine issues as to what Martin
told Hinojosa on August 1, and as to what Conry, Kennedy, and
Hinojosa said during the August 3 conference call, the disputes
are not material.  See Weeks Martin, Inc. v. Fireman's Fund
Ins., 340 F.3d 233, 235 (5th Cir. 2003) ("An issue is material
if its resolution could affect the outcome of the action.")
Therefore, the Court GRANTS CCA's motion for summary judgment.
(Dkt. No. 45.)

2. COBRA Insurance and Stock Options

CCA asks the Court to "dismiss [Hinojosa's] remaining
claims for alleged lost insurance and stock options." (Def.'s
Mot. Summ. J. 2.)  The Court does not understand that Hinojosa
asserts CCA's alleged failure to send him his COBRA form as a

distinct cause of action.  Rather, he alludes to these matters as examples of disparate treatment compared to another employee. (First Am. Compl. 6; Dkt. No. 49, Pl.'s Resp. 8, 26.)

Similarly, the Court understands Hinojosa's claim for recovery of his 2005 and 2006 stock options as damages for his discrimination claim.  In his deposition, Hinojosa seems to suggest that his complaint includes a distinct breach of contract claim regarding the 2005 and 2006 stocks.  (Hinojosa Dep. 254:3-7, 255:18-25.)  However, nowhere in his pleadings does he claim that he is entitled to the 2005 and 2006 stock options by the terms of the stock agreements.  Having granted CCA's motion for summary judgment on Hinojosa's discrimination claims, the Court does not need to address the extent of his alleged damages.

### IV. Conclusion

For the foregoing reasons, the Court GRANTS CCA's motion for summary judgment (Dkt. No. 45.)

DONE at Laredo, TX, this 12th day of January, 2010.


George P. Kazen
Senior United States District Judge